UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: JUN 0 9 2015
```

Wax NJ-2, LLC,

                    Plaintiff,

              —v—

JFB Construction & Development and GF 55
Partners,

                    Defendants.

13-cv-4537 (AJN)

OPINION

ALISON J. NATHAN, District Judge:

   Plaintiff Wax NJ-2, LLC ("Wax" or "Plaintiff") is a franchisee of European Wax Center,

a nationwide chain of body-waxing salons.  Wax owns and operates a European Wax Center

location in the Forest Hills neighborhood of Queens, New York, and this lawsuit arises out of a

dispute over the construction of that store.  Invoking the Court's diversity jurisdiction under 28

U.S.C. § 1332, Wax brings suit against the architectural firm responsible for designing and

inspecting the construction of the store, GF 55 Partners ("GF55" or "Defendant"), alleging that

GF55 committed architectural malpractice by failing to measure, design, and inspect the

construction of the Forest Hills store with an acceptable degree of professional care.  Wax also

named as a defendant the contractor responsible for construction at the Forest Hills site, JFB

Construction & Development ("JFB"), but that entity has opted not to defend itself since its

counsel withdrew on September 23, 2014, *see* Dkt. No. 108, and failed to respond to an order to

show cause why default judgment should not be entered, returnable November 4, 2014, *see* Dkt.

No. 114.  Accordingly, this matter came before the Court for a two-day bench trial held on

October 20-21, 2014, involving only Wax's claims against GF55.

   Under the Court's standard practice for nonjury trials, the parties submitted affidavits

containing the direct testimony of witnesses under their control in advance of trial, as well as

1

affidavits containing the responsive and rebuttal testimony of those witnesses, if any.  The Court received from Plaintiff declarations from Wax's sole member, Daniel T. Perlman, along with Plaintiff's witness Gregg Genovese and Plaintiff's expert witness Philip Charles Gavosto; Perlman submitted a rebuttal declaration as well.  From Defendant, the Court received affidavits of direct and rebuttal testimony from GF55 founding partner David Gross, and from Defendant's expert witness Anthony DiProperzio.  At trial, the parties conducted live cross- and redirect examination of Perlman, Genovese, Gavosto, Gross, and DiProperzio, and read into the record deposition testimony from Swayne Shu, a representative of Wax's landlord at the Forest Hills site.  The parties stipulated to the admissibility of all exhibits submitted in advance of trial by both parties, *see* Tr. 2:6-10; Ct. Ex. 1, which included Plaintiff's Exhibits 1-145 and Defendant's Exhibits 1-16, and which the Court admitted into evidence, *see* Tr. 23:17-19.  Also introduced and admitted into evidence during trial were Plaintiff's Exhibits 146-50, and Defendant's exhibits 17-20.

The parties submitted a Joint Pre-Trial Statement on May 23, 2014, Dkt. No. 67, and pre-trial proposed findings of fact and conclusions of law on August 22, 2014, Dkt. Nos. 94 & 95.  In November 2014 the parties submitted amended findings of fact and conclusions of law reflecting the evidence submitted at trial, Dkt. Nos. 118 & 119, as well as post-trial memoranda of law, Dkt. Nos. 120-22.

With the trial and post-trial briefing now concluded, this opinion details the Court's findings of facts and conclusions of law, as required by Federal Rule of Civil Procedure 52(a)(1).

## I.      Findings of Fact

In light of the evidence presented at trial, the Court's assessment of the witnesses' credibility (based on both the content of their testimony and the witnesses' demeanor), and the inferences reasonably to be drawn from the evidence, the Court makes the following findings of fact.  The findings are not exclusive, insofar as additional findings of fact are contained in the next section as well, as necessary.

### A.  Selection of the Austin Hills Site and the Preliminary Assessment

2

On December 29, 2010, Daniel Perlman obtained from European Wax Center's corporate office to open a European Wax Center in the Forest Hills neighborhood of Queens, New York. Perlman Decl. ¶¶ 1, 3. To that end, Perlman began negotiations with Sawyen, LLC ("Sawyen"), the landlord of 70-10 Austin Street in Forest Hills, for a commercial lease. Perlman Decl. ¶¶ 4, 13. Sawyen's representative in the relevant negotiations was Swayne Shu, and the entity was represented in the negotiations by Howard Hua. Tr. 15:8-16. At the time that Perlman and Shu first began negotiations, the space that Wax would eventually occupy was comprised, at least in part, of two stores. Pl. Ex. 2; Perlman Decl. ¶ 4. Shu informed Perlman that Wax could take either existing store in its entirety, and add portions of the other store by moving the demising wall[1] between them, as long as the store not used by Wax maintained an area of at least 600 square feet. Pl. Ex. 2; Perlman Decl. ¶¶ 4, 9-10.

In September 2012, Perlman contacted David Gross, a founding partner at GF55, for the purpose of getting a preliminary measurement of the available space. Perlman and Gross had worked together previously on a European Wax Center in Rutherford, New Jersey. Perlman Decl. ¶ 5; Gross Decl. ¶ 5. A September 21, 2012 email from Perlman to Gross indicates that GF55 agreed to take a look at the space on the morning of September 24, 2012, and to provide Wax with an initial concept and layout for the store. Pl. Ex. 2; Perlman Decl. ¶ 7; Gross Decl. ¶ 9. At the time, an existing tenant was still in at least one of the stores, and Perlman indicated to Gross that the evaluation would have to be conducted early in the day because the existing tenant did not want his workers to know that the tenant was being evicted. Pl. Ex. 2; Gross Decl. ¶ 9. Perlman's email also told Gross that "[t]he $/sf is very high, so the less space I need for the waiting area and 6 wax rooms, the better." Pl. Ex. 2. Gross anticipated that the pair would be able to "poke around" from 8:30 to 9 a.m. Pl. Ex. 2.

Gross emailed his initial plan to Perlman on the same day that he made his first visit to the site. *See* Pl. Ex. 2; Perlman Decl. ¶ 7. This drawing indicated that the area of the proposed

---

[1] A "demising wall" is a wall between two adjacent rooms or spaces, in contrast to an exterior wall, which does not abut an interior space.

European Wax Center was 1914 square feet, which compared to a measurement of 1775 square feet for the same area in an older drawing of the same space provided to Perlman by Sawyen. Pl. Ex. 2; Perlman Decl. ¶ 7.  Gross replied to Perlman that square footage is a "legal fiction," and that he did not know how the landlord calculated the square footage.  Pl. Ex. 2; Perlman Decl. ¶ 7.  Gross's figures represented a calculation of the "gross square footage," which when used throughout this opinion refers to a measurement from the exterior of each external wall (that is, the front and back walls of the store), and the midpoint of each demising wall.  A measurement of net square footage, by comparison, refers only to the usable interior space measured from the inside faces of all walls.

### B.  The October 9, 2012 Plan and the Lease Negotiations

The site plan went through several revisions in the weeks after September 24, 2012, although it was always contemplated that Wax's store would use all of the existing space as well as part of the adjacent space.  Gross Decl. ¶ 12; Perlman Decl. ¶¶ 9-10.  On October 9, 2012, GF55 provided Wax with a preliminary floor plan that Perlman found satisfactory, and began to use as the basis of his negotiations with Sawyen.  Perlman Decl. ¶ 11.  This plan indicated that the gross square footage of Wax's store would be 1235 square feet, while the adjacent store would be left with 565 square feet.  Gross Decl. ¶ 13; Perlman Decl. ¶ 11; Pl. Ex. 4.  To draw the October 9, 2012 plan, Gross relied on measurements that he took with a tape measure at the site, as well as photocopies of plans provided to him by Perlman.  Gross Decl. ¶ 10; Tr. 85:1.  Gross made some assumptions based on the old plan about the thickness of the demising walls and the rear exterior wall, as he was not able to measure those items during his visit.  Tr. 85:18-20; Gross Decl. ¶ 10.

On October 10, 2012, Perlman sent an email to Shu explaining the redesign, and attaching the October 9, 2012 plan.  Pl. Ex. 13.  Perlman's email also indicated that it might be possible to "pick up" some space behind a wall on the right side of the Wax Center space, which would then allow him to cede some space elsewhere back to the adjacent store, but that this ultimately would not be clear until construction began.  Pl. Ex. 13.

4

Wax and Sawyen entered into a letter of intent for a lease of the Austin Street space on November 20, 2012. Pl. Ex. 5. The letter identified the premises as having an area of "approximately 1235 square feet," and a copy of the plan showing the same was attached. Pl. Ex. 5; Perlman Decl. ¶ 13. The initial term of the intended lease was eight years, with two consecutive renewal options for five years, and annual rent was calculated at $125 per square foot with a three percent annual escalation. Pl. Ex. 5. GF55 took no direct part in Wax's lease negotiations with Sawyen. Gross Decl. ¶ 14.

During the continuing lease negotiations after Perlman and Shu signed the letter of intent, Sawyen's attorney, Howard Hua, contacted Gross and informed him that an additional 26 square feet of space was not usable by the adjacent tenant, but could be added to the area of Wax's store. Perlman Decl. ¶ 18. Perlman intended to accept the revision and pay additional rent at the same annual rate of $125 per square foot to include this space in his store. Perlman Decl. ¶ 18. GF55 drew a revised plan incorporating this space into Wax's store, but measured the additional area as 29 square feet, for a new total of 1264 square feet. Perlman Decl. ¶ 18. Regardless of this measurement by GF55, Wax's lease was adjusted upward by 26 square feet to incorporate this additional space, which became part of Wax's store. Perlman Decl. ¶ 21; Pl. Ex. 11. The 29 square-foot figure was never incorporated into the lease, nor relied upon to calculate Wax's rent. The additional square footage was incorporated into GF55's plans sometime between November 21, 2012 and December 3, 2012. *See* Def. Ex. 8 (November 21, 2012 plan); Pl. Ex. 10 (December 3, 2012 plan); Tr. 16:9-11.

Wax and Sawyen finalized the lease on December 14, 2012, with Wax's rent based on a measurement of 1261 square feet. Pl. Ex. 103. Attached to the lease were plans drawn by GF55, dated both November 30, 2012 and December 3, 2012. Pl. Ex. 103. The initial lease term runs from March 10, 2013 to December 31, 2020, with two successive options for Wax to extend the term by five years. Pl. Ex. 103.

## C. GF55's Responsibilities

GF55 sent a proposed agreement for architectural services to Wax on November 20, 2012, the same day that Wax entered into the letter of intent with Sawyen. Gross Decl. ¶ 7; Pl. Ex. 6. Under the agreement, GF55's scope of work included a site survey and evaluation; evaluation of the store conditions in order to advise Wax of potential demolition or engineering issues; creation of a layout design for corporate approval; creation of a construction document set; submission of the plans to Wax's corporate office for final approval; submission of the plans to the New York City Department of Buildings for approval; issuance of the plans to be used for contractor bidding; revision of the plans for a final issue of construction documents after bidding; being "available to resolve construction issues" by phone or email; and providing design drawings for mechanical, electrical, and plumbing work suitable for construction and bidding. Pl. Ex. 6.

Perlman sent an email to Gross on November 26, 2012, indicating that the agreement was "fine" and that he would send a check. Perlman Decl. ¶ 16; Pl. Ex. 8. Perlman also included some questions "for clarification purposes," one of which was about an extra charge for a "site survey drawing," which Perlman explained was not charged when the parties worked on their first Wax location together in New Jersey. Pl. Ex. 8. Gross replied that the charge was for when he "went and measured and confirmed the size of the shop." Pl. Ex. 8. Perlman raised no further issue regarding this charge.

In addition to its responsibilities laid out in the parties' contract, GF55 agreed to perform certain inspections required by the City of New York under the Department of Buildings Directive 14. Tr. 104:1-8; Pl. Ex. 30. Directive 14 is a New York City Department of Buildings regulation that allows certain parties making applications to alter a building to conduct only a limited review for compliance with the New York City Building Code. To qualify for Directive 14 status, an alteration application must not affect a building's Certificate of Occupancy. Gavosto Decl. ¶ 7. In a February 14, 2013 email, Irene Berzak, an expeditor with whom Gross worked and who was initially involved with the Austin Street project, explained to Gross the requirements for conducting a compliance inspection under Directive 14. Pl. Ex. 51. These

6

responsibilities were: 1) making sure the finished construction conforms with the approved plans and, if not, amending the plans to match the conditions; and 2) doing whatever is required by code for special inspection obligations assumed under the TR1 form. Pl. Ex. 51. On January 17, 2013, Gross signed a TR1 form in which he took on responsibility for inspecting "Firestop, Draftstop, and Fireblock systems," "Energy Code Compliance," "Fire-Resistance Rated Construction," and for conducting a final inspection. Pl. Ex. 30. The final TR1 submitted after construction was complete, however, indicated that Gross was no longer responsible for "Energy Code Compliance." Pl. Ex. 64.

### D. Changing Plans and the Wax-JFB Contract

Between October 9, 2012 and January 8, 2013, the plans for Wax's store on Austin Street went through several iterations. On November 26, 2012, European Wax Center's corporate office approved a plan dated November 21, 2012. Perlman Decl. 16 at ¶¶ 3-11. However, these plans had to be changed in light of Wax's acquisition of an additional 26-29 square foot area from the landlord, which was reflected on the December 3, 2012 plans created by GF55. Perlman Decl. ¶ 19, Gross Decl. ¶ 15, Pl. Ex. 10. Perlman sent the December 3 plans to two contractors, JFB and Ridge Construction Corp., to begin the process of obtaining bids to build out the store. Perlman Decl. ¶¶ 19-20. In an email to JFB owner Joseph Basile, Perlman explained that they were "preliminary construction documents" that were still under review by John Gulyas at European Wax Center's corporate office. Perlman Decl. ¶ 23; Pl. Ex. 12. The Corporate office completed its review of the site drawings on December 20, 2012, and issued a certificate of approval to Perlman. Perlman Decl. ¶ 25; Pl. Ex. 16. As noted above, Wax entered into a formal lease for the space with Sawyen on December 14, 2014. Perlman Decl. ¶ 26.

GF55 provided Wax with another updated set of plans on December 28, 2012, Pl. Ex. 28, and yet another set of plans on January 8, 2013, Def. Ex. 16. The January 8, 2013 set was submitted to the New York Department of Buildings for approval. Gross Decl. ¶ 15. Both the December 28, 2012 and January 8, 2013 set of plans continued to indicate that the size of Wax's finished store would be 1264 square feet. Plaintiff's Exhibit 144, which is a photograph of the

7

Department of Buildings-approved plans left at the construction site by Perlman, demonstrates that it was the January 8, 2013 set that was approved by the City.  Pl. Ex. 144; Perlman Decl. ¶ 35.

Wax entered into a written contract with JFB for demolition and construction at the Austin Street site on January 10, 2013.  Perlman Decl. ¶ 30; Pl. Ex. 19.  Although the City did not approve the site plans until January 28, 2013, JFB created an initial construction schedule and began work by January 23, 2013.  Perlman Decl. ¶ 33.  Perlman delivered the approved plans to the site on the day that the City approved them, January 28, 2012.  Perlman Decl. ¶ 35.

### E.  The Demising Wall Problem

At an uncertain time during construction in January 2013, but in no event later than January 28, 2013, an issue arose between European Wax's corporate office, JFB, and GF55 over the relocation of the store's demising wall.  In order to relocate the demising wall to a distance of 14 feet, 7 inches from the far end of Wax's store, as called for by GF55's January 8, 2013 plans, it became apparent that the wall would have to move into the doorway of the adjacent store. Gross Decl. ¶ 15.  An email from John Gulyas at European Wax Center's corporate office to Gross on January 28, 2013 accused Gross of creating the error by measuring the space incorrectly.  Perlman Decl. ¶ 34; Pl. Ex. 35.  GF55 responded that the problem was not with the measurements, but rather that JFB built the wall in the wrong place.  Gross Decl. ¶ 20; Pl. Ex. 35.  Gross testified at trial that it was his understanding that it would be acceptable to draw plans that would require moving the front door of the adjacent space.  Tr. 90:7-18.  The extent to which moving the demising wall would interfere with the adjacent doorway is ambiguous at best from the plans prepared by GF55 up through and including the January 8, 2013 set that was approved by the Department of Buildings.  While that set explains that the demising wall will be moved and marks the width of the store at that wall as 14 feet, seven inches, the drawing also depicts the far end of the demising wall as flush against the joint of the adjacent store's doorway. Def. Ex. 16.  Gross explained that the drawing was not intended to accurately depict the adjacent

8

site, but rather was meant to show only Wax's space, as any necessary work on the adjacent space would be the landlord's responsibility to complete. Tr. 93:22-94:10.

Because Wax did not want to move the adjacent doorway, and after some initial proposed solytions were rejected, the parties eventually agreed to fix the problem by leaving approximately 12 feet, 6 inches of the existing demising wall in place (measuring from the front of the store to the back). Gross Decl. ¶ 21. GF55 prepared a revised plan showing this fix on January 31, 2013. *See* Pl. Ex. 27. Because the demising wall was not being moved as intended, this compromise solution ceded some amount of square footage back to the adjacent store. Pl. Ex. 27.

The initial version of the revised drawing indicated that Wax's store now measured 1156 square feet—a difference of 108 square feet from the previous plan. Pl. Ex. 27; Perlman Decl. ¶ 42. As Gross explained in an email to Perlman, and as internal GF55 emails show, this substantial difference was the result in GF55 inadvertently labeling the drawing with net instead of gross square footage, meaning unlike all previous measurements, this number did not take into account the thickness of any of the exterior or demising walls. Pl. Exs. 40 & 41. GF55 actually measured the lost space as ten square feet. Perlman Decl. ¶ 43; Gross Decl. ¶ 21; Def. Ex. 12. Perlman called Sawyen to try to obtain a reduction in Wax's rent based on the lost square footage, but the landlord did not respond. Perlman Decl. ¶ 45.

Swayne Shu of Sawyen, testifying by deposition read into the record at trial, said that at some point Perlman contacted to him to try to remeasure the space and determine the "correct" number. Tr. 198:1-4. Shu then said that he "d[id]n't care" what number Perlman gave him, and that he (Shu) believed he had the correct number. Tr. 198:6-7. The number, he said, was a "take it or leave it" offer to Wax. Tr. 198:11. He also explained that he did not consider the square footage of the store to be a negotiable item, and that he would not negotiate over the square footage in any attempt to renew the lease. Tr. 202:10-16.

Perlman's testimony contains several references to Gross's purported "measurement error," and to Gulyas's conclusion that GF55's measurements *caused* the store to be less than 14

9

feet, seven inches in width. *See* Perlman Decl. ¶¶ 34, 40, 41, 45. In context, however, Gulyas's comments accuse Gross of incorrectly measuring the width of the store, and are not meant as a broader indictment of his measurement of the square footage; Gulyas was concerned about the store functioning as a European Wax Center, and was not considering whether Gross had "mismeasured" the overall square footage of the Austin Street site. *See* Pl. Ex. 35 (email from Gulyas explaining that the "space is not working").

### F. Deficient Construction and Final Inspections

It is undisputed between Wax and GF55 that JFB's construction of the Austin Street store was deficient in a number of ways. Unless otherwise noted, the parties remaining in this action agree that the following items deviated either from New York City's Building Code, or from GF55's final plans, or both.

#### 1. Code Items

##### a. Black Iron

The New York City Department of Buildings requires the use of a material known as "black iron" in the construction of ceiling support systems. Gavosto Decl. ¶ 25. Although GF55's plans called for the installation of black iron, JFB instead used steel wire to hang the ceiling. Gross Decl. ¶ 33; Perlman Decl. ¶ 72; Genovese Decl. ¶ 22. The lack of black iron in Wax's store is a deviation from New York City's building code and must be remedied. Gross Decl. ¶ 34.

##### b. Fireproofing Steel Beams and Decking

JFB did not fireproof the steel beams in the store, or install "firestopping" as was required by GF55's plans and City code. Gavosto Decl. ¶¶ 35-40. Gavosto reported the lack of firestopping to the City after he discovered it. Gavosto Decl. ¶ 35.

##### c. Low-Voltage Wiring

The parties stipulated that the low-voltage wiring installed above the ceiling was not up to code, and that rewiring is necessary to bring Wax's store into compliance. Pl.'s Proposed Findings ¶ 36; Gavosto Decl. ¶ 37 (explaining wiring did not comply with code).

10

### 2.  Items Not Implicating City Codes

#### a.  Partition Walls

GF55's plans, as drawn, required partition walls between rooms in Wax's store to be built the metal deck above the ceiling. Gavosto Decl. ¶ 45. JFB built the partition walls only up to a few inches above the ceiling level, rather than to the metal deck. Gavosto Decl. ¶ 45. The space at the top of the partition walls allows noise to travel more easily throughout the location. Gavosto Decl. ¶ 45; Perlman Decl. ¶ 81.

#### b.  The Brick Feature and 48-Inch Clear Area

GF55 designed the store to have a 48-inch area clear in front of the door in order comply with "ANSI" requirements. Pl. Ex. 148; Tr. 145:1-25. Gross explained at trial that "ANSI" is a "safe harbor code" laying forth requirements for handicapped accessibility. Tr. 145:24-25. Genovese testified in his declaration that relocation of a brick feature at the front of the store is required to make the construction conform to the plans. Genovese Decl. ¶ 21.

GF55 does not dispute that JFB built the brick feature differently than was called for in the plans. Wax attempts to cast the placement of the brick feature as a code issue, based on GF55's drawing labeling the 48-inch space as compliant with ANSI. However, Wax has not demonstrated that the "ANSI code," as identified by GF55 in its drawing, is also part of New York City Building Code. Neither Genovese nor Gavosto testified that the 48-inch clearance was a code requirement, and Gross testified credibly that there are "other ways" to ensure compliance with code, Tr. 146:7, and that the store as built complies with legal requirement for egress, Tr. 147:18-19. *See also* Genovese Decl. ¶ 21 (describing relocation of brick feature, but not identifying it as a code violation). Accordingly, the Court concludes that Plaintiff has demonstrated a deviation from GF55's plans in the construction of the brick feature, but has not demonstrated that this deviation led to a violation of New York City code.

#### c.  Bathroom Tile

Wax and GF55 stipulated that JFB did not install tile in the store's bathroom at the correct height. Pl.'s Proposed Findings ¶ 47; Genovese Decl. ¶ 40.

11

### d.  Demising Wall at the Storefront Glass

The portion of the demising wall between Wax's store and the adjacent space was constructed incorrectly by JFB.  Genovese ¶ 19.  The wall finishes into glass installed at the front of the store, and only one side of the wall was finished with sheetrock.  Genovese ¶ 19.  This left the other side of the wall exposed and visible through the glass, allowing views of the framing, insulation, metal studs, and back of the sheetrock.  Genovese ¶ 19.  The wall would have to be rebuilt in order to be finished properly so that the wall's innards are not exposed.  Genovese ¶ 19.

### e.  Sound Insulation

Though the agreement between Wax and JFB called for the use of "sound batt insulation with wool," JFB used fiberglass insulation between the rooms in the store.  Perlman Decl. ¶¶ 49-50.  Sound batt insulation was required as a matter of contract between Wax and JFB.  Perlman Decl. ¶ 49.

### G.  Expert Testimony

### 1.  Plaintiff's Expert

Wax submitted a declaration containing expert testimony from Philip Charles Gavosto, an architect familiar with commercial and retail projects in the New York City area.  Gavosto Decl. ¶ 3.  GF55 also cross-examined Gavosto at trial.  Gavosto stated expert opinions about both the standard of professional care with which an architect must measure a retail space, and an architect's duty to inspect.

### a.  Duty to Inspect

Gavosto explained, based on files maintained by the New York City Department of Buildings, that GF55 was authorized to certify the plans for construction of Wax's store under Directive 14.  Gavosto Decl. ¶¶ 5, 7-8.  Gavosto described a form identified as a "TR1 Technical Report Statement of Responsibility" ("TR1"), which identified the inspections that GF55 was required to perform to certify the project under Directive 14, and which Gross signed on January 17, 2013.  Gavosto Decl. ¶¶ 8-9.  Gavosto opined that, based on his review of the plans prepared by GF55 partners on December 28, 2012 and January 8, 2013, and his inspection of the site,

Gross's certification in the final TR1 form (Pl. Ex. 64) that the work performed substantially conformed to the approved construction document and complied with all relevant code provisions, rules, and regulations was "false."  Gavosto Decl. ¶¶ 5, 12.  Gavosto found that the work neither substantially conformed to the documents, nor complied with the relevant code provisions and regulations.  Gavosto Decl. ¶ 12.

According to Gavosto, the "accepted custom, standard and practice is for an architect on a directive 14 project to inspect the work as it is ongoing" to ensure compliance with "the approved plans, and the building code, rules and regulations of the City of New York."  Gavosto Decl. ¶ 28.  He further pointed to the TR1 form itself, which he said requires "progress inspections during the course of the work in order to certify at project completion that the project conforms to the plans, rules, codes and regulations."  Gavosto Decl. ¶ 28.

Turning to the discrete deficiencies at the Austin Street store, Gavosto stated that any "reasonably prudent architect exercising a reasonable degree of care would have instantly recognized the lack of black iron if an inspection were made during construction as it should have been."  Gavosto Decl. ¶ 29.  Basing his opinion on photos taken during construction and provided to him by Perlman, Gavosto declared that it was so "glaring and apparent" that black iron was missing that either Gross must not have performed the inspections, or his performance fell substantially below the appropriate standard of care.  Gavosto Decl. ¶¶ 29-30.  Furthemore, even if Gross had missed the lack of black iron during progress inspections, Gavosto explained that Gross should have caught it in his final inspection, as it would have involved nothing more than moving aside a ceiling tile.  Gavosto Decl. ¶ 32.

Gavosto's testimony also touched on the lack of firestopping.  Again beginning from a direct reading of the TR1, Gavosto explained that the form required Gross to conduct such an inspection because Gross had checked "yes" next to the relevant box on the form.  Gavosto Decl. ¶ 36.  Gavosto's declaration echoes his conclusion regarding black iron by stating that the lack of firestopping was "glaring and obvious," and that it would have been recognized if an inspection were performed with a reasonable degree of care.  Gavosto Decl. ¶ 36.

13

### b.  Measurement

In addition to his review of the construction plans and independent inspection of the store, Gavosto also took his own measurement of the area of the store to compare with GF55's. Gavosto testified that he measured the "actual gross square footage" of the spaced leased by Wax as 1232 square feet.  Gavosto Decl. ¶ 42.  He defined "gross square footage" to mean a measurement from the midpoint of the demising walls on each side of the store, and to the exterior of the front glass and the exterior of the rear block wall.  Gavosto Decl. ¶ 42.  He arrived at his measurement using Tek-4 Ryobi laser distance measure, and calculated the results using AutoCad 2007 software.  Gavosto Decl. ¶ 42.  According to Gavosto, his measurement also includes a 13.4 square-foot area near the front of the store, where the entry door is set back from the rest of the front store glass, and he claims Gross's measurement did not include this area. Gavosto Decl. ¶ 42.  Thus, although in absolute terms the difference between Gross's measure and Gavosto's measurement is 32 square feet, Gavosto identifies the actual difference in their measurements as 45.4 square feet, because the additional 13.4 square feet were measured in an area that Gross did not include as part of the store.  Gavosto Decl. ¶ 42.

Gavosto's stated that when measuring field conditions in order to draw the layout of a store, the accepted professional standard of care requires an architect to be accurate "within tenths of a foot."  Gavosto Decl. ¶ 44.  Compared to this standard, he states that Gross's measurement of 1264 square feet is "so far off that it cannot be described as anything other than a significant deviation from the generally accepted standard of care … ."  Gavosto Decl. ¶ 44.

### 2.  Defendant's Expert

GF55 presented declaration testimony from Anthony DiProperzio, a registered architect in the state of New York and then-President of the Long Island chapter of the American Institute of Architects.  Wax cross-examined DiProperzio at trial.   DiProperzio presented expert opinion regarding GF55's measurement of the Austin Street site and GF55's duty to inspect.

With regard to GF55's measurements, DiProperzio testified that he endeavored to make an independent evaluation of the area of the store, based on his own measurements and the original drawings used by GF55 to determine the thickness of the exterior and demising walls. DiProperzio Decl. ¶ 7. DiProperzio's measurement came to 1291.2 gross square feet, with an interior floor area of 1131.2 square feet. DiProperzio Decl. ¶ 32. He testified that GF55's measurement was consistent with the governing standard of care for an architect even though it was less than his own measurement, and that deviations in measurements between architects are common, especially when there are "dead" space and irregular angles in an occupied space. DiProperzio Decl. ¶¶ 9-10. He further testified that "a degree of variations is expected from one individual to the next" when measuring square footage. DiProperzio Decl. ¶ 10.

As for the installation of black iron, DiProperzio testified that black iron is a New York City code requirement. DiProperzio Decl. ¶ 11. He then explained that GF55's approved set of plans contained a notation that "specifically forbids" the use of steel wire and indicates that the contractor must use black iron. DiProperzio Decl. ¶ 12. DiProperzio stated that it is "unequivocal that a contractor is obligated to build form the approved set of plans," not just as a matter of custom and practice, but also as a matter of "good sense and prudence." DiProperzio Decl. ¶ 13.

### H. JFB's Default

Shortly before trial was scheduled to begin, JFB Construction's counsel moved to withdraw, citing nonpayment of fees and JFB's expressed intent not to defend itself any further. See Dkt. Nos. 104 & 105. The Court granted counsel's motion, and informed JFB that, as an artificial entity, it must be represented by counsel or face default. Dkt. No. 108. No counsel noticed an appearance for JFB by the deadline set by the Court, nor has any attempt to notice such an appearance been made since. On the first day of trial (October 20, 2014), the Court entered an order to show cause why default judgment should not be entered against JFB, Dkt. No. 114, to which there has been no response.

### II.     Conclusions of Law

15

The Court reaches the following conclusions of law based on the facts as found above, as supplemented by further resolution of any factual disputes as noted below. Although Plaintiff has pleaded a single cause of action for architectural malpractice against GF55, its theories of liability, each of which carries separate damages, require the Court to decide whether two distinct actions (or omissions) by Defendant constitute architectural malpractice: GF55's alleged mismeasurement of the area of Wax's store, and GF55's alleged failure to inspect the construction for compliance with New York City regulations and conformance with GF55's own plans. Because both theories implicate the standard for architectural malpractice under New York law, the Court will first describe that standard, and then will consider each theory of liability in turn.

### A. Architectural Malpractice Under New York Law

The parties generally agree on the standard governing architectural malpractice claims in New York. New York courts consider claims of architectural malpractice under the general standard applied to all professional negligence claims. *See Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15, 18 (2d Cir. 2000). To succeed in such an action, a plaintiff must prove both that the defendant departed from the "accepted standards of practice," and that the departure proximately caused plaintiff's injury. *Bruno v. Trus Joist a Weyerhaeuser Bus.*, 87 A.D.3d 670, 672 (N.Y. App. Div. 2011) (citing *Kung v. Zheng*, 73 A.D.3d 862, 863 (N.Y. App. Div. 2010)). Unless the facts and circumstances of the case would permit a lay person to evaluate whether an architect's performance lived up to the accepted standards of practice in a given case, the plaintiff bears the burden to present expert evidence setting forth the appropriate standard of care. *530 E. 89 Corp. v. Unger*, 373 N.E.2d 276, 277 (N.Y. 1977); *see also Sitts v. United States*, 811 F.2d 736, 739 (2d Cir. 1987).

In addition to the question of whether Wax has proven that GF55 committed architectural malpractice under the governing standard, however, both theories of liability in this case also implicate the antecedent question of whether GF55 has a professional duty to render the services that Wax claims were deficient. While the parties dispute the scope of GF55's professional

16

responsibilities, neither suggests a legal framework for determining it.  In *Ossining Union Free School District v. Anderson LaRocca Anderson*, 539 N.E.2d 91 (N.Y. 1989), the New York Court of Appeals considered the appropriate scope of duty in negligence actions, particularly ones alleging negligent performance of professional duties.  The discrete holding of *Ossining* is that, to sustain an action for negligent misrepresentation, a plaintiff must establish privity of contract with the defendant, or something approaching privity to the extent that reliance on the representation was the "end and aim of the transaction." *Id.* at 94-95.  A relationship so near privity could be demonstrated by proof of "(1) [the defendants'] awareness that the reports were to be used for a particular purpose or purposes; (2) reliance by a known party or parties in furtherance of that purpose; and (3) some conduct by the defendants linking them to the party or parties and evincing defendant's understanding of their reliance." *Id.* at 95 (citing *Credit Alliance Corp. v. Arthur Andersen & Co.*, 483 N.E.2d 110, 118 (N.Y. 1985)).  Though *Ossining* itself involved the tort of negligent misrepresentation, its reasoning extends naturally to other sorts of professional negligence, and the Appellate Division has so extended it on at least one occasion. *See Melnick v. Parlato*, 296 A.D.2d 443, 443 (N.Y. App. Div. 2002).

Accordingly, to demonstrate a defendant's liability for a tort of professional negligence, a plaintiff must first show either that it contracted for the service or was in a relationship nearing contractual privity with regard to the service, or that the faulty service complained of would ordinarily be performed by such a professional in the course of performing its obligations under a contract (or in a relationship approaching a contractual one). *See A.J. Contracting Co. v. Trident Managers, Inc.*, 234 A.D.2d 195, 195-96 (N.Y. App. Div. 1996).  The plaintiff must then show that the professional's services deviated from the "accepted standards of practice" in the relevant field, and that such deviation proximately caused the plaintiff's injuries.

### B. GF55 Is Not Liable For Its Allegedly Incorrect Measurements

The square footage dispute turns on two questions: did GF55 owe Wax a duty of accurate measurement for Wax's use in negotiating a lease with its landlord?  And if so, did GF55's performance fall below the accept standards of architectural practice?

**1. Wax Has Not Demonstrated that GF55 Had a Duty to Measure for the Purpose of Wax's Lease Negotiations.**

There is no doubt that by September 24, 2012, Perlman engaged Gross to conduct an examination of the existing store and to design a preliminary plan for Wax. *See* Pl. Ex. 2 (email chain); Perlman Decl. ¶ 7; Gross Decl. ¶ 5. Gross's initial measurement of the square footage of the store arose from that meeting, and Perlman noticed on the same day as that initial meeting that GF55's measurement of the area of the store was different from the original plans for the building. Pl. Ex. 2. It is also clear that Perlman knew that this measurement was used as a basis for preparing GF55's preliminary plans of October 9, 2012, which called for Wax's store to have an area of 1235 square feet. Pl. Ex. 4; Perlman Decl. ¶ 11. This figure was adjusted upward to 1261 square feet when Wax accepted Sawyen's offer of an additional 26 square feet (as measured by Sawyen), but continued to serve as the basis for that final measurement of the store's area that was used to determine Wax's rent.

However, that Wax used the square footage figure in GF55's design does not mean that GF55 had a professional duty to accurately measure the space for the purpose of Wax's lease negotiations. Wax and GF55 had not yet entered into a formal contract for architectural services when Wax first informed its landlord that it intended to lease 1235 square feet of space. That conversation began on October 10, 2012, *see* Perlman Decl. ¶ 12, while GF55's proposed agreement for architectural services was not sent to Wax until November 20, 2012, *see* Pl. Ex. 6. Accordingly, Wax was required to present evidence demonstrating a relationship near privity with GF55 for the purpose of obtaining an accurate measurement, such that GF55 would expect that its measurement would be used for negotiating a lease. Wax has failed to do so.

The linchpin of Wax's argument that GF55 could foresee Plaintiff's use of the square footage figure in its lease negotiations was Perlman's initial string of emails engaging Gross to survey the Austin Street site, in which Perlman explained, "The $/sf is very high, so the less space I need for the waiting area and 6 wax rooms, the better." Pl. Ex. 2. But this isolated line from a single email was not enough to make GF55 aware that its measurements might be used

18

for the particular purpose of negotiating Wax's lease. *See Ossining*, 539 N.E.2d at 95. While Perlman expressed a desire to have a compact store in order to keep his rent low, Wax did not establish that he informed Gross that Gross's measurement would be used for the purpose of lease negotiations. Nor has Plaintiff established that Gross acknowledged that his measurement would be used for that purpose. In fact, Plaintiff has failed to show that the statement about the high rent per square foot was even a request that Gross provide an accurate measurement of the store. Read in context, it could just as readily mean that Wax wanted a store *design* that was as small as possible. Because Perlman's original email indicated that he intended to take one of the existing spaces in its entirety, and leave at least 600 square feet of the other space, it would have been clear to Gross from this initial contact that the stores would be redesigned. Pl. Ex. 2. Gross testified credibly at trial that he understood the purpose of measuring the space to be for use in crafting the design of a future Wax Center, and that he never made an explicit or implicit agreement to measure for the purpose of negotiating a lease. Tr. 82:11-25. Plaintiff did not establish at trial that an architect would ordinarily understand his or her duties when measuring a space to include giving an accurate-to-the-square-foot measurement of the area so that a client could then negotiate a lease with the landlord.

Perhaps Wax would argue that it entered into an explicit, written contract with GF55 on November 20, 2012, and that it did not finalize its lease until December 14, 2012. Pl. Ex. 103. It might also point out that the sets of plans that it appended to its lease were prepared on November 30, 2012 and December 3, 2012. Pl. Ex. 103. Even if GF55's preliminary drawings did not carry with them a duty to accurately represent the square footage of the finished space, this theory might go, the existence of the contract and repeated revision of the plans changed its professional duties by this point. However, the contract between Wax and GF55 also does not contain any indication that GF55's services would be used for the purpose of negotiating Wax's lease, or that Wax was contracting with GF55 for the purpose of getting an accurate measurement that it could use for its own purposes. *See* Pl. Ex. 6. Nor was it established that

19

that GF55 was, or should have been, aware that Wax was using its numbers for this purpose at the time.

Accordingly, the evidence presented at trial demonstrated that Wax engaged GF55 to measure the Austin Street site for a particular purpose: so that GF55 could design a European Wax Center franchise.  While GF55's alleged mismeasurements may have been actionable if they caused GF55 to perform this contracted-for service below the accepted standard of professional care, Wax's allegations are not that the plan itself deviated from the standard of professional care.  Wax has alleged that GF55's *measurements* deviated from the standard of care.  To that end, Wax has not shown that it requested, or that GF55 could reasonably foresee, that its measurements would be used for the purpose of negotiating Wax's lease, and that was not the service Wax engaged GF55 to provide.  Wax's claim based on "lost" square footage must therefore fail, because GF55 did not owe a duty to Wax to measure the space for the purpose of negotiating the lease.

> ## 2.   Even If GF55 Had Assumed a Professional Duty to Measure the Austin Street Space Accurately, Its Performance Did Not Depart From the Accepted Standard of Care.

The lost square footage aspect of Wax's claim against GF55 would fail even if Wax had adequately demonstrated that GF55 owed a professional duty to provide Wax with an accurate measurement of the area of the store.  As has already been mentioned, Wax was obligated to present expert testimony setting forth the accepted standard of practice for architects when measuring the area of a space.  It did so through the testimony of Philip Charles Gavosto, who stated that "in measuring field conditions for a layout, such as this, a very slight deviation, in the range of tenths of a foot, may be acceptable."  Gavosto Decl. ¶ 44.  In any event, Gavosto declared that a measurement of 1264 square feet deviated from the standard of care.  Gavosto Decl. ¶ 44.  Neither this purported professional standard nor Gavosto's conclusion that GF55's performance deviated from the appropriate standard holds up to scrutiny.

In the first instance, the standard of care that Gavosto proposes—that measurements may suffer from "very slight deviation[s]" on the order of "tenths of a foot"—squares neither with the overall evidence in this case, nor the expert testimony otherwise offered at trial. The weight of the credible evidence demonstrates that this is too strict of a standard. Gavosto himself initially measured the difference between the "actual" square footage of the store and Gross' measurements as exceeding 100 square feet. Tr. 169:14-24. This number then changed to the more modest difference that Wax has relied on at trial after Plaintiff's counsel told Gavosto to "refine the number to make sure it was accurate." Tr. 187:15-16. That Gavosto's measurements changed by over 50 square feet during the course of his work on behalf of Wax demonstrates that "within tenths of a foot" is likely a too demanding standard for reasonably competent architects in the field, unless Gavosto's initial measurement seriously deviated from the accepted standard of practice. The fact that three architects—Gross, Gavosto, and DiProperzio—have measured the space four times, and come up with different square footage figures each time, is strong evidence that measurements do not need to be accurate within tenths of a foot to meet an acceptable standard of care.

Gavosto's testimony on cross-examination and redirect also undermined his declaration testimony that measurements must be accurate within tenths of a foot to meet the accepted standard of practice. He testified that finished and occupied spaces are more difficult to measure and might lead to greater deviations in measurement than unoccupied spaces, because some areas in a finished space might be hidden or inaccessible. Tr. 174:3-11. This conclusion was in accord with DiProperzio's expert testimony for the defense, *see* DiProperzio Decl. ¶ 10, but Gavosto does not explain what effect it might have on the "within tenths of a foot" standard to measure in finished spaces, which he states would ordinarily be subject to greater deviations. Though Perlman at one point testified that the space was not occupied before Wax moved in, Tr. 78:4, in context it appears more accurate to state that no one else was occupying the space at the moment Perlman and Gross met on September 24, 2012 to take the initial measurements; the rest of Perlman's testimony and other credible evidence in the record demonstrates that the space was

finished and previously occupied. Tr. 78:9-19; Pl. Ex. 2 (email from Perlman to Gross stating that existing tenant did not want his employees to know that he was being evicted); Gross Decl. ¶ 26.

Based on the internal inconsistencies in Gavosto's testimony, and Gavosto's own differing measurements despite his proposed "within tenths of a foot" standard, the Court finds that Gavosto has not credibly stated the correct standard of care for an architect measuring a space. On the other hand, DiProperzio credibly testified that it is common for architects to arrive at differing measures of the square footage in a given space, particularly in occupied spaces. DiProperzio Decl. ¶ 10. DiProperzio also explained that features such as concealed "dead space" and irregular angles may be calculated differently by different architects, and that the Austin Street site featured both of these challenges. DiProperzio Decl. ¶ 10. He explained that measuring a finished space is not an "exact science," and that any deviation under five percent of the total area of the floor would be within the acceptable professional standard for measuring a space. Tr. 215:17, 23-25. DiProperzio's testimony was cogent, consistent, and credible, and the Court finds that, in the context of this case, the "five percent" standard is an accurate statement of the accepted standard of practice for architects.

Judged against the appropriate standard, GF55's measurement of Wax's space did not deviate from the standard of professional care. DiProperzio credibly testified that his measurement of the gross square footage (that is, from the outside of the exterior of the front and rear walls and midpoint of the demising walls) was 1291.2 square feet. The interior floor area, per his calculations, was 1131.2 square feet. DiProperzio spent between an hour and a half and two hours at the site when taking his measurements, using a tape measure to determine the square footage of the entire store. Tr. 211:14-25. Although Gavosto testified that his measurement was more accurate because he used state-of-the-art laser measuring equipment and went into the roof were there were fewer obstructions, DiProperzio explained that that he does not "think it's normal for an architect to crawl up inside of a ceiling to take measurements for the purposes of determining gross or net rentable space." Tr. 216:7-11. Indeed, because GF55's

22

purpose in taking the measurements was to use them in a proposed layout of Wax's store, it is not clear why a measurement of the space from the roof would be more useful than a measurement taken of the accessible areas of the store. DiProperzio also explained that Gross's assumptions based on the thickness of the exterior walls, which he could not measure himself during his site visit, were reasonable, and that even minor differences between the actual conditions and those reasonable assumptions could have significant implications for the square footage of the store. Tr. 213:16-19; *see also* Tr. 85:21-24 (Gross cross-examination). Ultimately, DiProperzio's testimony demonstrated that GF55's measurement, which deviated from DiProperzio's measurement by about two percent, fell within the standard of care. *See* Tr. 215:11-13. Wax has not shown by a preponderance of the evidence that Gross's work was deficient.

Though it is not essential to the Court's conclusion, the Court notes that it is not strictly correct to posit that 1264 square feet was GF55's "measurement" of an extant store, because the space GF55 designed with dimensions creating this total area existed only in theory at the time that the plans used to negotiate the lease were prepared. As the plans show and Gross repeatedly testified, GF55 expected that the demising wall between the Wax space and the adjacent store would move, and 1264 square feet was thus meant to be the area of the finished space, if constructed according to plan. At the time Perlman negotiated the lease with Sawyen, all indications are that it was indeed his plan to create a space that would measure 1264 square feet (including the 1235 square feet in the original plan, plus an additional 29 square feet after Sawyen offered the extra closet space and Wax accepted). Even if the store as constructed did not have these particular dimensions, Wax has not shown that it was because of a failure on GF55's part to measure correctly; it may just as easily have been a failure to construct the store according to plan. In a similar vein, because Wax's lease entitles it to 1261 square feet, to the extent that the actual square footage is lower, Wax may simply be occupying less space than it bargained for; that the finished store in its post-construction state may not use all of the space

that Wax negotiated for does not mean its pre-construction negotiation for a certain amount of space was necessarily erroneous.

The Court initially understood part of Wax's argument to be that GF55's plans were faulty in failing to show that moving the demising wall would place it into the doorway of the adjacent store, and that because Wax ceded space back to the adjacent store once this was discovered during construction, GF55's plans effectively caused it to "lose" 10 square feet for which it is paying.  Wax's post-trial memorandum of law appears to back away from this argument, and instead claims only that GF55 measured a space that is 1218.6 square feet and identified it as 1264 square feet. *See* Pl. Mem. of Law at 17 (Dkt. No. 120).  As an initial matter, this direct comparison is not an appropriate way to judge GF55's performance.  The "1264 square feet" measurement provided by GF55 did not measure the same space at the 1218.6-square foot measurement by Gavosto, because Gavosto's measurement took into account the alteration to the plans at the front of the store to avoid building into the adjacent doorway, whereas GF55's 1264-square foot measurement would have included the demising wall being moved to the full proposed width of 12 feet, 7 inches.  But even understood as an argument that GF55 should be liable for "losing" 10 square feet because its initial design would have required moving the adjacent doorway, the Court finds it unconvincing.  First, if it was professional error to design the store such that the demising wall would require relocation of the adjacent store's doorway (which the parties dispute), this would be a claim that GF55 provided Wax with a defective *design*.  It would not tend to indicate that GF55 mismeasured the area of an extant store, because a store with the demising wall in the location proposed by GF55 did not yet exist. But Wax has not raised any claims that GF55's design itself was defective.  Plaintiff's entire argument is that GF55 provided it with an incorrect number for the final square footage, when compared "apples-to-apples" with Gavosto's number.  Any potential claim based on lost square footage because of a need to change GF55's design while construction was ongoing has not been pleaded.

Furthermore, even if such a claim had been pleaded, Wax has not demonstrated by a preponderance of the evidence that GF55's designs deviated from the accepted standard of care and thus caused Wax to lose 10 square feet for which it must pay regardless. The parties disputed whether Wax represented to GF55 that it would be permissible to assume in the plans that aspects of the adjacent storefront could be redesigned, and the credible evidence ended up in equipoise. Gross testified that his plans depicted the store as desired by Wax, and that it was his understanding that aspects of the adjacent store (such as the doorway) could be moved if they interfered with the plans. Tr. 90:7-13; 95:11-16. Perlman disputed this account, and pointed to GF55's plans, which he states did not depict the demising wall moving into the adjacent store. Perlman Rebuttal Decl. ¶ 23. While it is true that the plans as prepared by GF55 did not show the demising wall moving into the adjacent doorway, Wax has not shown that GF55 was under a professional obligation to represent the conditions of the adjacent store. No expert testimony was given about an architect's duty to depict conditions in adjacent spaces. Without any clear standard against which to judge any purported deviation by GF55 in its design of the demising wall, the Court cannot conclude that GF55's design constituted professional malpractice.

As the above analysis demonstrates, Wax has shown neither that GF55 owed it a professional duty to measure the Austin Street space for the purpose of permitting Wax to enter into a lease indicating the exact square footage with its landlord, nor that GF55 deviated from the accepted standard of care when measuring the Austin Street site. The Court finds that GF55 is not liable on this aspect of Plaintiff's claim.

### B. Failure to Inspect

Like the theory that GF55 improperly measured the area of the Austin Street store, Wax's failure to inspect claim is pleaded in terms of architectural malpractice. As discussed above, this requires proof that GF55 had a professional duty to inspect the items that Wax now claims are defective, that GF55's performance of the inspections deviated from the accepted standard of care for an architect, and that such deviation proximately caused Wax's injuries. *See supra* at 16. GF55 contests the existence of a duty and proximate cause, but concedes that, were the

25

inspections Wax complains of actually required, Gross did not carry them out with the requisite measure of professional care. On cross-examination, Gross stated, "I was there once or twice during demolition, and I went to final, and obviously I didn't – didn't take the ceiling tiles down, I didn't inspect the ceiling and I didn't inspect the firestopping properly. I missed it, okay? … I missed it. I didn't see it." Tr. 111:3-8. When asked if he should have checked to see if the rooms were safe, Gross similarly responded that he "didn't do a good job on [sic] this area." Tr. 113:16. Defendant's post-trial memorandum of law acknowledge that "GF55 duly acknowledged its impudence pertaining to certain inspections services," Def. Mem. at 2 (Dkt. No. 121), and the Court finds that Wax has demonstrated this element of its claim by a preponderance of the evidence. With that established, the Court must step back and determine the scope of GF55's duty.

### 1. GF55 Had a Professional Duty to Conduct Only Such Inspections as Were Specifically Required by the TR1 Form.

Recall that a duty to perform a professional services arises either because a party contracted for that particular service, or standard professional practice would require the performance of that duty as part of the professional's ordinary performance of duties. *See supra* at 17. Plaintiff has not met its burden of establishing that the inspections it claims that GF55 negligently conducted are an ordinary professional obligation of architects retained to design a store layout. In cases alleging a duty to inspect, a contract between the parties is often the source of the alleged duty, even though the contract may not wholly define the scope or standard of the duty. Professionals who contract to render services have a duty of due care to perform those services with the requisite degree of professional care. *See Am. Tel. & Tel. Co. v. N.Y.C. Human Res. Admin.*, 833 F. Supp. 962, 984 (S.D.N.Y. 1993); *see also Travelers Indem. Co. of Ill. v. 28 E. 70th St. Constr. Co.*, 296 F. Supp. 2d 476, 482-83 (S.D.N.Y. 2003) (denying motion to dismiss tort claims alleging contractor's negligent performance of inspections required by contract); *cf. In re R.M. Kliment & Frances Halsband, Architects*, 821 N.E.2d 952, 954 (N.Y. 2004) (describing, in context of deciding the appropriate statute of limitations, the line of cases

holding that contractual relationship can imply duty to perform professional services with due care). Accordingly, a contract for architectural services may impose a duty to inspect, and a plaintiff may bring a tort claim if the architect fails to perform that inspection with due care. *See City of Rochester v. Holmsten Ice Rinks*, 155 A.D.2d 939, 939 (N.Y. App. Div. 1989); *Diocese of Rochester v. R-Monde Contractors, Inc.*, 562 N.Y.S.2d 593, 596 (N.Y. Sup. Ct. 1989).[2]

The contract between GF55 and Wax does not mention inspections within the scope of GF55's services, *see* Pl. Ex. 6, but it is undisputed that GF55 agreed to perform inspections under Directive 14 as part of its involvement with the project. *See* Pl. Ex. 30; Tr. 101:1-14. Gross also acknowledged at trial that his signing of the TR1 form, which indicated his inspection responsibilities, carried with it a professional obligation. Tr. 101:2-3. Per the TR1 form, GF55's inspection responsibilities included "firestop, draftstop, and fireblock systems," "fire-resistance rated construction," and a "final" inspection, with the relevant Building Code sections identified next to each inspection. Pl. Ex. 30. The form further required Gross to certify that he would make "final inspection of the construction work, including those inspections during its progress necessary to my certification upon final inspection that all work substantially conforms to approved construction documents and applicable laws and rules." Pl. Ex. 30.

Wax argues that this phrase from the TR1 form requiring Gross to inspect that "all work substantially conforms to approved construction documents" required GF55 to inspect every aspect of the store to ensure that it conformed to the plans as drawn, whether or not the item inspected implicated New York City regulations. Wax's argument assumes that the TR1 form is capable of imposing private liability at all, rather than simply creating an obligation to the City of New York that can be enforced only by the City itself. The form states that false filings, or failure to file a certification, will be met with sanctions by the City of New York. *See* Pl. Ex. 30

---

[2] *Diocese of Rochester* notes that a plaintiff may also bring a breach of contract action in these circumstances, relying on *Sears, Roebuck & Co. v. Enco Assocs., Inc.*, 372 N.E.2d 555, 558-59 (N.Y. 1977), *superseded in nonrelevant part by* 1996 N.Y. Sess. Laws ch. 623 (amending N.Y. C.P.L.R. 214(6)), *as recognized in In re R.M. Kliment*, 821 N.E.2d at 953-54. Because Wax has not alleged a breach of contract against GF55, the Court considers its claims only under a tort theory of liability.

at 3. And while the form clearly establishes GF55's duty to the City, its terms do not explicitly impose any additional liability to any private party. Furthermore, even if private liability were found to flow from GF55's assumption of obligations under the TR1, the question would remain whether Wax was the correct party to enforce it. Wax neither signed nor is mentioned in the TR1; Shu signed the formed on behalf of Sawyen as the owner of the property, and is the only party other than Gross that signed the form.

However, GF55 does not argue that Wax cannot raise a claim because it was not a beneficiary of the inspections under the TR1, or because the TR1 created duties only to the City of New York. Accordingly, any such argument is waived, although there is good reason to believe that New York courts would find that by signing the TR1, GF55 assumed a duty to Wax that can be vindicated by a professional malpractice action. New York cases have held that liability on a self-certification project need not end at the boundary of privity, and may extend to others who are harmed when a professional fails to perform a duty. These cases tend to arise in the context of harm to property adjoining the one for which the professional took on self-certification obligations. In *27 Jefferson Ave., Inc. v. Emergi*, 846 N.Y.S.2d 868, 871 (N.Y. Sup. Ct. 2007), the court explained that one who undertakes a duty to self-certify construction plans assumes a duty not only to the Department of Buildings, but also to adjacent property owners who may be harmed as a result of improper certification. The court in *11 Essex St. Corp. v. 7 Essex St., LLC*, 2009 N.Y. Misc. LEXIS 6186, at *10 (N.Y. Sup. Ct. Sept. 15, 2009), similarly held that an engineer's filing of a TR1 form raised "issues of fact" regarding liability for damage to an adjacent building. *See also Mastrobattista v. Borges*, 2012 N.Y. Misc. LEXIS 4758, at *43-45 (N.Y. Sup. Ct. Oct. 4, 2012). While the New York Court of Appeals does not appear to have waded specifically into disputes involving self-certification of construction plans in general or the TR1 form in particular, it long ago announced the general principle that when a statute or regulation is enacted for the "special benefit" of an adjoining property, such property owners have the implied right to damages from a person who breaches it. *See Chotapeg, Inc. v. Bullowa*,

50 N.E.2d 548, 550 (N.Y. 1943) (failure to protect a party wall shared by property owners during demolition).

None of these cases consider whether the obligation to undertake a self-certification inspection can give rise to privately enforceable duties to third parties other than owners of adjoining buildings, but the principle that inspections undertaken for the particular benefit of a third party give rise to a private right action when they are conducted negligently would capture Wax's allegations. GF55 does not contest this conclusion. The inspections were conducted to complete and certify a construction project paid for and contracted for by Wax, and that was ultimately designed to allow Wax to use the completed space. In these circumstances, and in the absence of any contrary authority, New York law permits Wax to bring suit.

The Court must therefore turn to GF55's argument that the inspections required by the TR1 form include only the items specifically enumerated on the form, and that GF55's professional duty did not extend to conducting inspections to ensure that the store was constructed in accordance with all aspects of Wax's construction contract and plans, in all respects. Wax's argument that GF55 was responsible for inspecting the items that do not explicitly implicate the Building Code and are not individually indicated on the TR1 form hinges on the language of the TR1 form itself. The form, in a paragraph discussing the certifier's responsibilities, requires that the person conducting the inspection "make final inspection of the construction work, including those inspections during its progress necessary to my certification upon final inspection that *all work substantially conforms to approved construction documents and applicable laws and rules.*" Pl. Ex. 30 (emphasis added). Based on a hyperliteral reading of this line, Wax asserts that it was entitled to have GF55 inspect every aspect of the construction at the site for conformance with every aspect of the construction documents.

The Court disagrees for two reasons. First and foremost, there is little reason to think that the New York City Department of Buildings, when crafting the language of the TR1 form, intended to ensure that the form created liability for an inspector as a guarantor of every aspect of the construction work at a self-certified site, rather than just the aspects that implicated the

29

Building Code and other regulations. Wax points to no authority tending to show that the City was interested in ensuring that inspection of elements of construction design that are purely matters of private contract, and to which the City would be indifferent one way or the other, was included within the scope of professional responsibilities of architects who sign a TR1 form. It defies logic to think the City had any such intention. And as cases such as *Chotapeg* demonstrate, behind the very notion that private liability can be based on failure to comply with certain regulations is the fact that those regulation were enacted for the "special benefit" of the person bringing suit; Wax has presented no evidence or argument that the Building Code regulations and TR1 form were enacted for the benefit of the lessee of a space to ensure its construction contract was followed. The TR1 responsibilities undertaken by Gross were self-evidently meant to ensure conformance with construction and safety codes, and enacted for the benefit of users of the building. There is no indication that New York law would impose a professional obligation to inspect so tangential to the purpose of safety inspections as Wax asserts that it does.

Second, even if the broader scope of inspections that Wax envisions were required, Wax has not demonstrated that the inspector's duty would be to ensure that construction conditions were fixed to match the plans. When expeditor Irene Berzak sent an email explaining GF55's obligations under the TR1, she wrote that if the conditions did not match the plans, GF55's duty would be to "amend *the plans* to match the conditions." Pl. Ex. 51 (emphasis added). Nothing in the record has cast this conclusion into doubt; while Wax has presented evidence regarding the standard to which a competent inspection must be held, it has not demonstrated that any responsibility other than this requirement to amend the plans flows from a competent inspection. Accordingly, at least insofar as it relates to any duty to inspect specifically for the purpose of ensuring that the construction conforms to the plans, Wax would not be entitled to the damages it seeks, which are the cost to bring the store into conformance with the plans. It would, at most, be entitled to a new set of plans reflecting the conditions of the store. It has not made this part of its prayer for relief.

In reaching this conclusion, the Court specifically rejects the testimony of Plaintiff's expert witness, Mr. Gavosto, describing a professional's inspection duties under a TR1 form. In large part, Gavosto's declaration merely recites what is readily apparent from the TR1. His testimony does not evince any independent basis of knowledge about the requirements for conducting the relevant inspections, but merely relies on his own reading of the TR1's terms, which a layperson would have been equally qualified to do. *See* Gavosto Decl. ¶¶ 8-10, 28, 36. The Court's overall impression of Gavosto's testimony was that his familiarity with inspections under Directive 14 did not extend beyond what he was able to glean from the TR1 forms in evidence in this case, and therefore his testimony regarding the requirements of Directive 14 inspections deserves little or no weight.

Accordingly, because such inspections are not explicitly called for by the TR1, GF55 was not under a duty to inspect for: the height of the partition walls, the brick feature at the front of the store and the 48-inch clear area; the bathroom tile; the demising wall at the storefront glass; and the sound insulation.

The Court also finds that Wax has not established by a preponderance of the evidence that GF55 was required to inspect the low-voltage wiring installed above the ceiling. The parties agree that JFB's installation of the low-voltage wiring did not conform to code and required remediation. *See* Pl. Proposed Findings ¶ 36 (Dkt. No. 117) (indicating stipulation); Gavosto Decl. ¶ 37 (describing wiring as noncompliant). However, Plaintiffs do not point to any requirement under the TR1 to inspect the wiring, and point only to the general obligation to ensure that the construction conformed to the approved plans, code, and rules. While the wiring does implicate code provisions, the parties stipulated that Plaintiff retained an electrical engineer "to provide the design and inspection services" for electrical work. *See* Def. Proposed Findings ¶ 17 (indicating stipulation). Perlman also testified that he hired an electrical engineer for electrical design, and that the electrical engineer had an obligation to come back and inspect the electrical work. Tr. 51:14-25; 52:1-7. Moreover, Perlman testified that the electrical engineer "also took part in the self-certification." Tr. 52:17-18. In the absence of any affirmative

31

indication that GF55 had a duty to inspect the wiring, and in light of the evidence that the electrical work was inspected separately by a separate entity, the Court finds that Wax has not established by a preponderance of the evidence that GF55 had a professional duty to inspect the low-voltage wiring.

## 2.  GF55's Failure to Inspect Proximately Caused Wax's Damages As to the Black Iron, Fireproofing, and Firestopping.

Because GF55 concedes that its inspections of the black iron and firestopping fell below the accepted standard of practice for an architect (or a professional conducting an inspection generally), the Court turns to the final element of Plaintiff's claim, proximate cause.  GF55's argument here is twofold: first, that its plans called for the use of black iron, and thus any failure to use black iron was JFB's fault; and second, that even if it had properly conducted the inspections, it would have been JFB's responsibility to remedy them, so Wax cannot seek damages from GF55.  Neither argument has merit.

As a general matter, New York courts have been loath to put too fine a point on the definition of proximate cause.  Instead, proximate cause is understood as a policy-based concept that limits the liability stemming from negligent conduct to manageable levels.  *Derdiarian v. Felix Contracting Corp.*, 414 N.E.2d 666, 670 (N.Y. 1980).  The concept is responsive to the nature of each case, and the question of proximate cause is generally committed to the finder of fact once a *prima facie* case has been established.  *Id.*  To make a *prima facie* showing of proximate cause, a plaintiff must demonstrate that the defendant's negligence was a "substantial cause" of the events creating the injury.  *Maheshwari v. City of New York*, 810 N.E.2d 894, 898 (N.Y. 2004) (quoting *Derdiarian*, 414 N.E.2d at 670).  Proximate cause can be severed by a third party's intervening act if such an act is "extraordinary under the circumstances," rather than a foreseeable consequence of the defendant's negligence.  *Id.* (quoting *Derdiarian*, 414 N.E.2d at 670).  A finding of proximate cause "need not be based on absolute certitude or exclude every other possible cause of injury."  *Equitable Life Assur. Soc. v. Nico Constr. Co.*, 245 A.D.2d 194, 196 (N.Y. App. Div. 1997).

Wax made a *prima facie* showing of proximate cause when it demonstrated that GF55 had an obligation to conduct the inspections required by the TR1, and when it showed that conditions that did not conform to the Building Code continued to persist after construction despite Gross's certification that the construction was up to code. *See* Pl. Ex. 64 (final inspection form). In the context of this case, that is enough to show that GF55's failure to inspect was a substantial cause of Wax's store being out of compliance with the Building Code. Although Gross testified on cross-examination that he informed JFB (through Basile) and Wax (through Perlman) during one of his site visits that black iron was required even though it was not being used, this is not sufficient to show that GF55 discharged its duty to inspect with the appropriate standard of care, even if true. The deficiency was neither reported to the Department of Buildings, as was required by the TR1 form, nor is there any documentary evidence that Wax was informed of the condition. The assertion that Wax was timely informed of the lack of black iron after GF55 noticed it was missing during construction is simply not credible. The Court finds, as a factual matter, that GF55 did not adequately apprise Wax or the City of the lack of black iron upon an appropriate final or progress inspection. Had GF55 conducted the inspections properly and alerted Perlman or the City to the deficient construction, the deficient construction could have been remedied. GF55 did not do so despite its professional obligation.

GF55's argument that the adequacy of its plans absolve it from liability for failure to inspect does not show any break in the chain of proximate causation. Instead, it impermissibly conflates two potential sources of professional liability: the drawing of its plans, and its post-construction inspections. Each needed to be performed with the requisite degree of professional care, but that does not mean GF55 could immunize itself against claims of deficient performance in one area by performing adequately in the other. As a matter of proximate causation, the adequacy of GF55's plans has no tendency to show that a deficient inspection of the work based on those plans could not have caused Wax damages.

As for GF55's argument that its inspections were wholly irrelevant to the type of damage Wax suffered because any deficiencies were initially caused by JFB's deficient construction,

33

GF55 again fails to demonstrate how JFB's *earlier* deficient performance breaks the causal chain between its negligent inspection and Wax's injury.  While JFB's failure to construct the store up to code was surely a contributing factor to GF55's negligent inspection in the sense that Wax would have suffered no damages had JFB's work been adequate, proximate causation is not limited to the single germinal cause of an injury.  As New York courts have explained, other causes of an injury need not be *excluded* to find proximate cause; it is enough that the act complained of was a substantial factor in causing the plaintiff's injury.  *See Equitable Life*, 245 A.D.2d at 196; *see also Wragge v. Lizza Asphalt Constr. Co.*, 217 N.E.2d 666, 670 (N.Y. 1966).  Here, GF55's professional failure to conduct an acceptable inspection has caused Wax to possess the deficient store it has today, and thus to incur the costs to bring it in line with New York City regulations.

GF55's position would make damages all but unavailable against professionals with a duty to inspect new construction.  Any time the inspector is not the person who performed the construction, an inspector could absolve herself or himself on the grounds that the contractor *caused* any defect in the construction to appear, and thus the construction would need to be remedied regardless of whether the inspector discovered the defect.  This reasoning is at odds with the very concept of contracting for a professional inspection.  Any contract for inspection services would be fraught with moral hazard, as the inspector would bear none of the risk for neglecting or even ignoring the professional duty to inspect.

It would similarly be against good sense to find that deficient construction was such an extraordinary intervening act under the circumstances that a failure to inspect cannot be linked causally linked to deficient construction.  Inspections, by their very nature, presuppose that there may be a deficiency, and the existence of the TR1 form demonstrates that failure to complete construction that conforms with fire code is, in fact, foreseeable—that is why an inspection is required at all.

For the foregoing reasons, the Court finds that GF55's failure to conduct the inspections required under the TR1 with an acceptable degree of professional care were a proximate cause of

Wax's injuries.  This being the final item necessary to demonstrate professional malpractice, the Court concludes that Wax has demonstrated GF55's liability on the architectural malpractice claim based on the failure to inspect for black iron, fireproofing, and firestopping, and turns to damages.

### 3.  Damages

Plaintiff has offered *prima facie* evidence of damages, and Defendant has not offered any evidence to dispute Plaintiff's figures or otherwise demonstrate that Plaintiff's calculations are incorrect.  The Court therefore finds that the cost to remediate the lack of black iron, and the appropriate measure of damages, is $35,070.  Pl. Proposed Findings ¶ 32 (indicating stipulation); Genovese Decl. ¶¶ 22 & 29.  The Court further finds that the cost to remediate the lack of fireproofing on the steel beams and metal decking, and thus the appropriate measure of damages, is $8000, with an additional $10,000 for protection and cleanup.  Genovese Decl. ¶¶ 38-39.  The Court finally finds that the cost to install firestopping, and the appropriate measure of damages, is $1177.  *See* Pl. Proposed Findings ¶ 55 (indicating stipulation); Perlman Decl. ¶ 78.  The Court finds that the total damages are $54,247.

### III.    Conclusion

The Court finds that Defendant GF55 Partners is liable to Plaintiff Wax NJ-2, LLC on Plaintiff's claim of architectural malpractice, with damages to be paid in the amount of $54,247. The Court further enters default judgment against Defendant JFB in the amount of $163,723. *See* Dkt. No. 114.  The Clerk is requested to enter judgment in accordance with this opinion.


SO ORDERED.

Dated: _____ June 9 _____, 2015
        New York, New York

_____
ALISON J. NATHAN
United States District Judge